UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>c/o U.S. Attorney's Office<br>601 D Street, NW<br>Washington, DC 20530,<br><br>                    Plaintiff,<br><br>        v.<br><br>APPROXIMATELY 523,507 BARRELS OF<br>STRAIGHT RUN FUEL OIL FORMERLY<br>ABOARD THE CRUDE OIL TANKER<br>ABYSS WITH INTERNATIONAL<br>MARITIME NUMBER 9157765,<br><br>                    Defendant. | Civil Action No. _____<br><br>**FILED UNDER SEAL** |

### UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff the United States of America (the "United States"), by and through the United States Attorney's Office for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against the defendant property, namely all petroleum-product cargo (the "Defendant Property") formerly aboard the Crude Oil Tanker Abyss (the "Abyss"), and alleges as follows.

### NATURE OF ACTION AND THE DEFENDANT IN REM

1.      This *in rem* forfeiture action arises out of an investigation by the Federal Bureau of Investigation ("FBI") and Homeland Security Investigations ("HSI") involving Iran's transportation and sale of oil products to benefit sanctioned Iranian entities. This action seeks to forfeit the Defendant Property, which originated from an oil terminal in Iran where it was loaded onto a Vietnamese oil tanker, the Abyss, and then transferred to another vessel using surreptitious

means to hide the Defendant Property's Iranian origin, moving the cargo into commerce by, and for the benefit of, the National Iranian Oil Company ("NIOC"), the Iranian Oil Terminals Company ("IOTC"), the Islamic Revolutionary Guard Corps ("IRGC") and the IRGC Qods Force ("IRGC-QF"), each of which has been designated by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia.

2.      The Defendant Property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(1) as foreign assets: (i) of an entity or organization engaged in the planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5) against the United States, citizens or residents of the United States, or their property: or (ii) affording a person a source of influence over such entity or organization.

3.      Defendant Property is not currently restrained. The United States requests the issuance of an arrest warrant pursuant to Rule G(3)(b)(ii) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") to the Federal Rules of Civil Procedure.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

5.      Venue is also proper within this judicial district pursuant to 28 U.S.C. § 1355(b)(2).

6.      Pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b), this court has jurisdiction for property subject to forfeiture on the high seas, which is where the Defendant Property is now located.

## FACTS GIVING RISE TO FORFEITURE

**A.    RELEVANT PARTICIPANTS IN THE IRANIAN OIL INDUSTRY**

### 1.    Iranian Ministry of Petroleum

7.    According to OFAC, "[t]he Iranian Ministry of Petroleum has been used by individuals at the highest levels of the Iranian regime to facilitate the IRGC-QF's revenue generation scheme." *See* https://home.treasury.gov/news/press-releases/sm1165. On October 26, 2020, OFAC designated the Iranian Ministry of Petroleum pursuant to Executive Order 13,224, as amended, "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the IRGC-QF." *Id.*

### 2.    The Islamic Revolutionary Guard Corps (IRGC) and the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF).

8.    The IRGC is a branch of the Iranian armed forces whose purpose is to defend the country's political system. The IRGC-QF is a branch of the IRGC that specializes in unconventional warfare and military intelligence operations. IRGC-QF's "support for terrorism [is] well known." *Hake v. Bank Markazi Jomhouri Islami Iran*, Civ. A. No. 17-0114 (TJK), 2022 WL 4130837, at *11 (D.D.C. Sept. 12, 2022).

9.    The Department of the Treasury has found "[t]he IRGC is Iran's most powerful economic actor, dominating many sectors of the economy, including energy, construction, and banking." https://home.treasury.gov/news/press-releases/tg1718.

10.    According to OFAC, "[t]he IRGC and its major holdings . . . have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the defense, construction, aviation, oil, banking, metal, automobile and mining industries." https://home.treasury.gov/news/press-releases/sm703.

11.     The IRGC and IRGC-QF use a network of shipping companies and front companies to hide their involvement in the sale and shipment of Iranian oil. Specifically, OFAC has found that the IRGC-QF uses a "complex network of intermediaries . . . to obfuscate its involvement in selling Iranian oil." https://home.treasury.gov/news/press-releases/sm767; *see also* https://home.treasury.gov/news/press-releases/tg1718 ("The IRGC, long a target of U.S. sanctions, has a history of attempting to circumvent sanctions by maintaining a complex network of front companies.").

12.     The Secretary of the Treasury has previously found that holding groups and companies in the petrochemical sector and elsewhere "provide financial lifelines to the IRGC." https://home.treasury.gov/news/press-releases/sm703.

13.     The IRGC generates substantial revenues from the sale of petroleum products. For example, OFAC has reported that "[i]n spring 2019 alone, this IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil, predominantly to the Syrian regime. These shipments, taken collectively, sold for more than half a billion dollars. The same network also sold nearly four million barrels of condensate and hundreds of thousands of barrels [of] gas oil, bringing in another quarter billion dollars." https://home.treasury.gov/news/press-releases/sm767.

14.     The IRGC uses the proceeds from the distribution of petroleum to fund its terror activities. For example, OFAC has found that: "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its malign activities throughout the Middle East." https://home.treasury.gov/news/press-releases/sm885; *see also* https://home.treasury.gov/news/press-releases/sm703 ("The profits from [the IRGC's economic] activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of

mass destruction (WMD) and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad.").

15.     The Secretary of the Treasury has stated: "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people."   https://home.treasury.gov/news/press-releases/sm885.

16.     On October 25, 2007, OFAC designated the IRGC-QF under Executive Order 13,224, which is "aimed at freezing the assets of terrorists and their supporters."   *See* https://2001-2009.state.gov/r/pa/prs/ps/2007/oct/94193.htm. In part, OFAC found that the IRGC-QF "provides material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command[.]" *Id.*

17.     On October 13, 2017, OFAC designated the IRGC pursuant to Executive Order 13,224 for providing material support, including training, personnel, and military equipment, to the IRGC-QF. *See* https://home.treasury.gov/news/press-releases/sm0177.

18.     On April 8, 2019, the President announced that the Government would designate the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act ("INA") (8 U.S.C. § 1189). *See* https://ir.usembassy.gov/statement-from-the-president-on-the-designation-of-the-islamic-revolutionary-guard-corps-as-a-foreign-terrorist-organization/. The announcement noted, in part, that "the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft," and warned that "[i]f you are doing business with the IRGC, you will be bankrolling terrorism." *Id.*

19.     On April 8, 2019, the State Department similarly announced the intent to designate the IRGC, including the IRGC-QF. *See* https://2017-2021.state.gov/designation-of-the-islamic-

revolutionary-guard-corps/index.html. That announcement noted that "[T]he IRGC—most prominently through its Qods Force—has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign." *Id.*

20.     On April 15, 2019, the Secretary of State published a notice in the Federal Register that he had designated the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the INA. *See* 84 Fed. Reg. 15,278 (Apr. 15, 2019), https://www.federalregister.gov/documents/2019/04/15/2019-07415/in-the-matter-of-the-designation-of-the-islamic-revolutionary-guard-corps-and-other-aliases-as-a.

21.     IRGC-QF official Rostam Qasemi (a/k/a Rostam Ghasemi), who previously served as the Iranian Minister of Petroleum from 2011 to 2013, "manages a group of individuals, shipping and oil companies, and vessels to sell Iranian crude, condensates, and gas oil." https://home.treasury.gov/news/press-releases/sm767. On September 4, 2019, OFAC designated Qasemi "for acting for or on behalf of the IRGC-QF and IRGC-QF Commander Qasem Soleimani." *Id.* Following the death of Soleimani in 2020, Qasemi "assumed a portion of former IRGC-QF Commander Qasem Soleimani's role in facilitating shipments of oil and petroleum products for the financial benefit of the IRGC-QF." *See* https://home.treasury.gov/news/press-releases/sm1165.

22.     The IRGC and IRGC-QF act in foreign commerce with specific aims to threaten U.S. interests and the national security of the United States, affecting U.S. commerce. The following is just a brief list of many examples of how the IRGC and IRGC-QF engage in foreign commerce and activities outside the borders of Iran to harm the interests of the United States:

         a.     In likely retaliation for the death of former IRGC-QF commander Qasem Soleimani, in 2021, a member of the IRGC used interstate commerce facilities in a failed

plot to commit murder-for-hire and provide material support to a transnational murder plot targeting former National Security Advisor John Bolton, https://www.justice.gov/opa/pr/member-irans-islamic-revolutionary-guard-corps-irgc-charged-plot-murder-former-national.

b.      In 2021, "[t]hrough the IRGC-QF, Iran continued its support to several U.S.-designated terrorist groups, providing funding, training, weapons, and equipment to various groups within the region. . . . Iran-backed militias continued sporadic attacks on [the U.S.] Embassy [in] Baghdad and bases hosting U.S. and other Defeat-ISIS forces in Iraq and Syria[,]" State Dep't 2021 Country Reports on Terrorism, at 125-26, available at: https://www.state.gov/wp-content/uploads/2023/02/Country_Reports_2021_Complete_MASTER.no_maps-011323-Accessible.pdf.

c.      In 2021, "Iran pursued or supported terrorist attacks against Israeli targets in 2021, including . . . a January bomb attack outside the Israeli embassy in New Delhi for which the Indian government said the IRGC-QF was responsible," *id.* at 215.

d.      From 2006 to 2009, a series of terrorist attacks by a group funded and supplied by the IRGC-QF killed or severely injured U.S. military servicemembers and civilians, *see Neiberger v. Islamic Republic of Iran*, Civ. A. No. 16-2193 (EGS/ZMF), 2022 WL 17370239, at *1 (D.D.C. Sept. 8, 2022).

e.      In 2007, the IRGC-QF continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that killed thousands of U.S. forces, and explosively formed penetrators that have a higher lethality rate than other types of improvised explosive devices, and were specially designed to defeat armored

vehicles used by U.S. forces in Iraq, *see Burks v. Islamic Republic of Iran*, Civ. A. No. 16-1102 (CRC), 2020 WL 13303322, at *2 (D.D.C. Aug. 21, 2020).

f.      In January 2007, the IRGC-QF led by Abdul Reza Shahla'i planned an attack in Karbala, Iraq that killed five U.S. soldiers and wounded three others, https://rewardsforjustice.net/rewards/abdul-reza-shahlai/; *see also Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 488 (D.D.C. 2021) (Mehta, J.).

g.      In June 1996, the IRGC was responsible for planning the attack on the Khobar Towers in Dhahran, Saudi Arabia, during which 19 U.S. Air Force personnel were killed and more than 350 were injured, *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 174 (D.D.C. 2010). IRGC senior officials recruited the attackers and worked in conjunction with them and Hezbollah, operating out of a terrorist base in the Bekaa or Beqaa Valley in Lebanon where the IRGC provided supplies and funds for the attack. *Id.*

23.     Through these actions and many others, the IRGC and IRGC-QF's terrorism affects foreign commerce in a manner that harms the interests of the United States, both domestic and abroad. Indeed, a significant purpose of the IRGC and IRGC-QF's campaigns of terror are to thwart the United States' diplomatic efforts, including its support for peace in the Middle East and recognition of Israel, by threatening the security of U.S. nationals and attempting to instill fear in the citizens of this country located within and outside its territorial boundaries. *See In re Sealed Case*, 936 F.3d 582, 592 (D.C. Cir. 2019) (criminal defendant's use of drug trafficking to support terrorist organizations "magnifies the effect of his conduct on commerce between the countries where he was operating and the United States"). These terrorist activities undertaken in foreign commerce plainly have a domestic effect on the United States and its domestic commerce.

3.      **The National Iranian Oil Company**

24.      The Iranian Ministry of Petroleum oversees NIOC, which "is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran." *See* https://home.treasury.gov/news/press-releases/sm1165.

25.      As this Court has noted, "NIOC is one of the world's largest oil companies and generates billions of dollars in revenue each year[.]" *Holladay v. Islamic Republic of Iran*, 523 F. Supp. 3d 100, 110 (D.D.C. 2021) (Moss, J.) (cleaned up). "[I]t functions primarily as a commercial entity aimed at the production and sale of oil." *Est. of Fishbeck v. Islamic Republic of Iran*, Civ. A. No. 18-2248 (CRC), 2021 WL 6808189, at *3 (D.D.C. Mar. 1, 2021).

26.      According to OFAC, NIOC is "an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's [IRGC-QF] and its terrorist proxies." *See* https://home.treasury.gov/news/press-releases/sm885. Indeed, as this Court has noted, NIOC "after funding its own operations and making investments in Iran's oil industry, its revenue goes to fund the Iranian government[,]" which "depending on the price of oil, revenue from NIOC is between one-third and two-thirds of the Iranian government's total revenue." *Holladay*, 523 F. Supp. 3d at 110 (quoting declaration).

27.      OFAC has found that NIOC supplies crude oil and condensate sold by the IRGC-QF. *See* https://home.treasury.gov/news/press-releases/sm767.

28.      On September 24, 2012, the U.S. Department of the Treasury submitted a report to Congress, as required by the Iran Threat Reduction and Syria Human Rights Act of 2012, finding that NIOC was an agent or affiliate of the IRGC. *See* https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx.

29.      On October 26, 2020, OFAC designated NIOC pursuant to Executive Order 13,224 "for having materially assisted, sponsored, or provided financial, material, or technological support

for, or goods or services in support of, the IRGC-QF." *See* https://home.treasury.gov/news/press-releases/sm1165.

30.     In designating and reporting on the activities of NIOC, the Treasury Department made clear that NIOC's efforts are not limited to the domestic borders of Iran, but instead, NIOC undertakes efforts in foreign commerce contrary to the interests of the United States. For example:

a.     in designating NIOC, OFAC noted that NIOC engaged in foreign commerce with the illegitimate Maduro regime in Venezuela, including by "charter[ing] multiple vessels to support the transport of tens of thousands of metric tons of gasoline destined for Venezuela[,]" *id.*;

b.     in designating entities working with NIOC, OFAC noted that NIOC worked with such entities to facilitate shipments of Iranian petroleum to foreign customers of NIOC, *see* https://home.treasury.gov/news/press-releases/jy1115;

c.     NIOC has entered into fossil fuel supply contracts with foreign organizations, committing itself to provide energy products to foreign companies, *see, e.g., Crescent Petroleum Co. v. Nat'l Iranian Oil Co.*, Civ. A. No. 22-1361 (JMC) (D.D.C. filed May 16, 2022), ECF No. 1 (Compl.) ¶¶ 1-2, 10-15, and using U.S. dollars to transact its business, *id.* ¶ 37; *see also id.*, ECF No. 1-6 at 23; and

d.     NIOC has entered into agreements to develop oil and gas fields with a Russian-owned energy company, Gazprom, which OFAC has designated under Executive Order 14,0424, as being Russian-government affiliated entities. *See* https://www.reuters.com/business/energy/iran-russias-gazprom-sign-primary-deal-energy-cooperation-2022-07-19/

31.     NIOC's use of foreign commerce to fund and provide material support to the IRGC and IRGC-QF thwart U.S. interests not just by providing a means to finance the wrongful actions of the IRGC and IRGC-QF, which plainly affect commerce with the United States, but also by providing support to regimes hostile to U.S. interests, including Russia. *See Sealed Case*, 936 F.3d at 589-50 (foreign commerce power allows Congress to outlaw activities "that lends financial support to terrorist organizations in foreign countries when that support merely 'affects' commerce with the United States"). These activities undertaken in foreign commerce plainly have a domestic effect on the United States and its domestic commerce.

32.     NIOC operates through itself and several subsidiaries or components, including IOTC.

### 4.     Iranian Oil Terminals Company (IOTC)

33.     According to the publicly available webpage for IOTC, IOTC is a subsidiary of NIOC that runs the Bandar Mahshahr Oil Terminal. Specifically, its website states that IOTC "[i]s one of the companies under [the] umbrella of National Iranian Oil Company [and] is an operational, specialized and professional organization that has the duty of all reservation affairs, crude oil, oil products, liquefied gas and marine services export and import operations along with providing measurement and lab services. This important task is under implemented [*sic*] by aiming at support and sustained continuation of oil and gas production in the country in four operational zones of Kharg Oil Terminals[.]"     IOTC, *Iranian Oil Terminals News Network*, https://www.iotco.ir/en/aboutus/introductioncompany (last checked July 13, 2023).

34.     IOTC is owned by the government of Iran.

35.     According to IOTC's website, the Bandar Mahshahr Oil Terminal is used for storing the products of the Abadan Refinery. https://www.iotco.ir/en/oilterminals/mahshahr-Mahshahr-Oil-Terminal. Imports and exports are carried out at Bandar Mahshahr. *Id.*

**B.      IMPORTANCE OF PETROLEUM AND SHIPPING INDUSTRIES TO THE IRGC**

36.      OFAC has observed that IRGC-QF deliberately utilizes a "complex network of intermediaries," including "dozens of ship managers, vessels, and facilitators," for the purpose of "obfuscate[ing] its involvement in selling Iranian oil." *See* https://home.treasury.gov/news/press-releases/sm767. That obfuscation allows the IRGC-QF and its intermediaries to access the international financial system and sell sanctioned Iranian oil to foreign customers.

37.      In spring 2019 alone, one IRGC-QF-led network employed more than a dozen vessels to transport nearly ten million barrels of crude oil and had taken steps to hide Iranian, IRGC, and NIOC involvement in certain transactions. *Id.* These shipments, taken collectively, sold for more than half a billion dollars. *Id.* The same network also sold nearly four million barrels of condensate and hundreds of thousands of barrels in gas oil, bringing in another quarter billion dollars. *Id.*

38.      Beyond funding the IRGC and the IRGC-QF's terrorist activities, the introduction of billions of dollars' worth of Iranian oil has broad effects on foreign commerce. Oil is a global commodity, pricing for which is set in global markets. Thus, increases or decreases in the supply of oil across the globe have a natural and predictable effect on global consumers, including consumers in the United States.

39.      In designating NIOC and the National Iranian Tanker Company ("NITC") under Executive Order 13,224, OFAC reported: "NIOC and NITC provide both the oil and tankers for the sale of Iranian oil by the IRGC-QF." *See* https://home.treasury.gov/news/press-releases/sm1165. "The cooperation and coordination between the IRGC-QF and these entities extends well beyond the simple sale of oil, including coordination between NIOC and the Central Bank of Iran to facilitate the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC-QF." *Id.*

40.     According to OFAC, the IRGC uses the proceeds from its involvement in the oil industry and other sectors of the Iranian economy to "support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad." *See* https://home.treasury.gov/news/press-releases/sm703.

41.     OFAC has reported that "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its malign activities throughout the Middle East." *See* https://home.treasury.gov/news/press-releases/sm885. The then-Treasury Secretary added: "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people." *Id.*

## C.     THE DEFENDANT PROPERTY ORIGINATED FROM BANDAR MAHSHAHR, IRAN AND WAS EXCHANGED USING SURREPTITIOUS MEANS TO DISGUISE ITS IRANIAN ORIGIN.

42.     The Abyss is a Vietnamese-flagged Aframax tanker, with a history of being an active carrier of Iranian oil, having previously transported Iranian crude oil and refined products at least nineteen times since 2019.

43.     The Abyss was featured in a YouTube video posted in June 2019 from a user in Kharg Island, Iran. The video was titled "NITC Tanker is ready to go.. for next destination."



*Source: Youtube*, https://www.youtube.com/watch?v=g5XCFcz0O8E

44.     In one instance in or around April 2019, the Abyss received approximately 716,000 barrels of crude oil from a NITC vessel, the Diamond II (IMO No. 9218478) via a ship-to-ship transfer.



45.     As to the Defendant Property here, on or around February 22, 2023, the Abyss arrived in the port of Bandar Mahshahr, Iran and positioned at berth.



46.     On or around February 23, 2023, the Abyss reported a change in draft consistent with loading approximately 612,262 barrels of gasoil.

47.     To avoid law enforcement and intelligence detection, the Abyss was manipulating her Automatic Identification System ("AIS") data to conceal her location while loading at Bandar Mahshahr.

48.     AIS is a system that automatically transmits a ship's position along with a timestamp and is intended to help government authorities identify vessels, assist in search and rescue operations, and provide supplementary information from other navigational systems, such as radar.

49.     Specifically, the Abyss's AIS transponder was offline from February 18, 2023, at 21:01 UTC to February 22, 2023, at 20:10 UTC. On February 23, 2023, the Abyss's AIS data

showed her as being present in the Persian Gulf, but then suddenly on February 24, 2023, she appeared on AIS in Southeast Asia off the coast of Thuan An, Hue. According to an expert in the maritime industry, this change in location is physically impossible and indicates the Abyss was manipulating her location data at the time she was claiming to be in the Persian Gulf.

50.     On or about February 27, 2023, the Abyss was captured on satellite imagery in the Gulf of Oman, where she updated her AIS data to report a charge in her draft depth from 12.8 meters to 8.2 meters and back again to 12.8 meters just 19 minutes later. Given how quickly these draft updates occurred, there was no transfer of the Defendant Property, and the Abyss was manipulating her AIS data.

51.     From March 4, 2023, to March 12, 2023, the Abyss's AIS data reported her position off the coast of Hue, Vietnam at the location 16.73804º N, 107.7579º E. As seen in the image below, the Abyss was not at the location she indicated in her AIS data in this timeframe.



*Abyss absent from the coast of Vietnam as reported to through its AIS*

52.     On or about March 17, 2023, the Abyss was captured in satellite imagery idling in the Riau archipelago off the coast of Indonesia.



53.     On or about March 26, 2023, the Abyss was captured in satellite imagery in the eastern anchorage of Singapore.



54.     On or around March 28, 2023, the Abyss was captured in satellite imagery being positioned by two tugboats to begin a ship-to-ship transfer with a storage vessel, in the anchorage of Sungai Linggi, Malaysia.

55.     The storage vessel is the property of a foreign company whose shares are listed on a United States stock exchange.

56.     Between on or around March 31, 2023, and on or around April 1, 2023, the Abyss and the storage vessel disengaged from the ship transfer, with the latter having onboarded a total of approximately 612,262 barrels of Iranian petroleum product from the Abyss.

57.     On or about April 1, 2023, the Abyss reported a draft depth of 9.0 meters, representing she no longer carried the Defendant Property, indicating that she had successfully transferred the Defendant Property to the storage vessel.

58.     The agreement under which the storage vessel took on the Defendant Property called for the purported owner of the Defendant Property, a United Arab Emirates-based company ("Purported Owner"), to remit payment for the storage in U.S. dollars.  Specifically, the relevant storage agreement called for a storage fee of USD $20,000 per day from the commencement of the agreement, a loading fee is USD $12,500 per day on a pro-rata basis, and a cargo discharge fee of USD $29,500 per day on a pro-rata basis.

59.     Additionally, the owner and manager of the Abyss have a history of conducting U.S. dollar transactions to facilitate the transportation of petrochemical products, including during the period that the Abyss was carrying the Iranian-sourced Defendant Property.

60.     Ahead of the Abyss's ship-to-ship transfer with the storage vessel, the Purported Owner presented fraudulent paperwork concerning the nature and origin of the Defendant Property.

61.     That paperwork represented that the Abyss took on the Defendant Property from Basrah, Iraq. That paperwork also represented that the cargo loading to the Abyss commenced at approximately 3:00 p.m. on February 21, 2023, and completed at approximately 4:10 p.m. on February 23, 2023, after which the Abyss sailed out of Basrah, Iraq on February 23, 2023.

62.     However, Iraqi fuel oil is not exported from Al-Basrah Oil Terminal in Basrah, Iraq, but only from Khor Al-Zubayr, Iraq. *See* Exxon Mobil, Basrah Heavy, https://corporate.exxonmobil.com/what-we-do/energy-supply/crude-trading/basrah-heavy (last checked July 13, 2023); Reuters, *Iraq's SOMO offers fuel oil term supplies for April to September* (Feb. 10, 2023), available at: https://www.reuters.com/business/energy/iraqs-somo-offers-fuel-oil-term-supplies-april-september-2023-02-10/#:~:text=SINGAPORE%2C%20Feb%2010%20(Reuters),validity%20up%20to%2020%20days.

63.     Moreover, satellite imagery reflects that the Abyss was not in Basrah, Iraq on or about February 21, 2023.

64.     Rather, as noted above, satellite imagery confirms that at the time the Abyss represented it was loading at Al-Basrah Oil Terminal in Iraq, the Abyss was actually near Bandar Mahshahr, Iran.

65.     The Abyss reported AIS data indicated that on February 23, 2023, she was located in the Persian Gulf and then on February 24, 2023, was in Southeast Asia off the coast of Vietnam. Traversing that distance within the time indicated is not possible for a vessel the size of the Abyss.

66.     On or about July 4, 2023, the Defendant Property was transferred to another vessel, which is presently located on the high seas.

**FORFEITURE**
**(18 U.S.C. § 981(a)(1)(G)(i))**

67.     The United States incorporates by reference the allegations set forth above as if fully set forth herein.

68.     Under numerous theories, the Defendant Property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(G).

**A.      The Defendant Property is the Property of NIOC, Which Has Perpetrated and Are Perpetrating a Federal Crime of Terrorism.**

69.     The Defendant Property is the property of NIOC (or its subsidiaries), which has perpetrated a federal crime of terrorism themselves, namely knowingly providing material support to a designated terrorist organization.

70.     In transferring the Defendant Property for the purposes of sale, NIOC and its subsidiaries provided or attempted to provide resources to IRGC or IRGC-QF, in violation of 18 U.S.C. § 2339B(a)(1).

71.     18 U.S.C. § 2339B prohibits persons from knowingly providing, or attempting to provide, material support or resources to a foreign terrorist organization or conspiring to do so.

72.     As noted above, the IRGC, including the IRGC-QF, is a foreign terrorist organization designated as such by the Secretary of State under INA Section 219, 8 U.S.C. § 1189.

73.     As described above, by selling or facilitating the sale of the Defendant Property, NIOC and its subsidiaries knowingly sought to aid the IRGC and IRGC-QF by providing a source of funding to them.

74.     NIOC and its subsidiaries' knowing material support of the IRGC and IRGC-QF occurred in foreign commerce as NIOC and its subsidiaries sought to peddle the Defendant Property to foreign purchasers, including using doctored records from a foreign country.

75.     NIOC and its subsidiaries' use of foreign commerce to provide material support to the IRGC and IRGC-QF has a sufficient nexus to the United States as the IRGC and IRGC-QF's wrongful actions affect U.S. commerce, including by killing U.S. nationals, and the introduction of billions of dollars of oil annually into the black market has predictable effects on the price of petroleum and other fossil fuels in the United States as crude oil and other fossil fuels are global commodities.  *See, e.g.,* CNBC, *An Iran nuclear deal revival could dramatically alter oil prices—if it happens*, available at: https://www.cnbc.com/2022/08/31/an-iran-nuclear-deal-revival-could-dramatically-alter-oil-prices.html (Aug. 31, 2022); Reuters, *Oil prices sink $2/bbl on possible Iran oil exports, rising interest rates*, available at: https://www.reuters.com/business/energy/oil-prices-rise-possible-opec-supply-cuts-2022-08-25/ (Aug. 25, 2022) ("Oil prices slumped by about $2 a barrel on Thursday in volatile trade as investors braced for the possible return to global markets of sanctioned Iranian oil exports and on worries that rising U.S. interest rates would weaken fuel demand."); World Bank Group, Middle East and North Africa Region, Office of the Chief Economist, *Lifting Economic Sanctions on Iran: Global Effects and Strategic Responses* (Feb. 2016), available at: https://documents1.worldbank.org/curated/en/298681467999709496/pdf/WPS7549.pdf ("The lifting of sanctions will have the strongest effect on oil production in Iran, and petroleum and coal products in Israel, the EU, and the US[.]").

76.     The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as an asset of an entity or organization engaged in planning or perpetrating a federal crime of terrorism.

**B**      **The Defendant Property is the Property of NIOC, Which Affords It a Source of Influence Over the IRGC an IRGC-QF.**

77.      The Defendant Property is the property of NIOC (or its subsidiaries), which affords them a source of influence over the IRGC and IRGC-QF, entities which have engaged in federal crimes of terrorism.

78.      As noted above, the IRGC, including the IRGC-QF, is a federal terrorist organization designated as such by the Secretary of State under INA Section 219, 8 U.S.C. § 1189.

79.      The IRGC and IRGC-QF have committed numerous terrorism-related offenses identified in 18 U.S.C. § 2332b(g)(5), including the killing and attempts to kill U.S. personnel proscribed by 18 U.S.C. § 1114.

80.      NIOC and its subsidiaries' efforts to sell and facilitate the sale of the Defendant Property were critical to furthering the affairs of the IRGC and IRGC-QF as "the profits from Iran's oil industry are its 'financial lifeline.'" *United States v. All Petroleum-Prod. Cargo Aboard the Bella*, Civ. A. No. 20-1791 (JEB), 2021 WL 4502056, at *4 (D.D.C. Oct. 1, 2021).  Indeed, such activities concerning the Defendant Property were used to further the affairs of the IRGC and IRGC-QF's terrorist enterprise and to make their prohibited conduct less difficult.

81.      The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as affording a person a source of influence over an entity or organization engaged in planning or perpetrating a federal crime of terrorism.

**C.    Alternatively, the Defendant Property is the Property of the Purported Owner, Which Affords It a Source of Influence Over NIOC and Its Subsidiaries, the IRGC, and/or the IRGC-QF.**

82.    Alternatively, the Defendant Property is the property of the Purported Owner, which affords it a source of influence over NIOC (and/or its subsidiaries), the IRGC, and/or IRGC-QF, entities which have engaged in federal crimes of terrorism.

83.    As noted above, the IRGC, including the IRGC-QF, is a foreign terrorist organization designated as such by the Secretary of Department under INA Section 219, 8 U.S.C. § 1189, and has committed federal crimes of terrorism identified in 18 U.S.C. § 2332B(g)(5).

84.    As noted above, NIOC and its subsidiaries have themselves engaged in planning or perpetrating a federal crime of terrorism, namely knowingly providing material support to the IRGC and IRGC-QF.

85.    The Purported Owner's supposed purchase of the Defendant Property was critical to furthering the affairs of the IRGC and IRGC-QF as "the profits from Iran's oil industry are its 'financial lifeline.'" *Bella*, 2021 WL 4502056, at *4.  Indeed, without firms acting as purchasers of Iranian-sourced petroleum, the efforts of the Iranian State Actors to obtain financing for the terrorist activities of the IRGC and IRGC-QF would fail.  Accordingly, were the Defendant Property the property of Purported Owner, its purchase of the Iranian-sourced petroleum made the prohibited conduct of NIOC (or its subsidiaries), the IRGC, and IRGC-QF less difficult.

86.    The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as affording a person a source of influence over an entity or organization engaged in planning or perpetrating a federal crime of terrorism.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the Defendant Property be forfeited to the United States for disposition according to law; and that the United States be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: July 14, 2023
      Washington, D.C.

          Respectfully submitted,

          MATTHEW M. GRAVES, DC BAR #481052
          United States Attorney

          By: _____ /s/ *Brian P. Hudak* _____
             BRIAN P. HUDAK
             KAREN P. W. SEIFERT
             MAEGHAN O. MIKORSKI
             RAJBIR DATTA
             ERIKA OBLEA
             Assistant United States Attorneys
             601 D Street, NW
             Washington, DC 20530
             (202) 252-7566 (main line)

          *Attorneys for the United States of America*

## <u>VERIFICATION</u>

I, Marcus Giebel, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 14th day of July 2023.


<u>          */s/  Marcus Giebel*          </u>
Special Agent Marcus Giebel
Federal Bureau of Investigation